Lyllian F. LIGHTHALL, Administratrix of the Estate of Albert C. Lighthall, deceased,

Arthur B. Anderson, Albert C. Lighthall, Jr., Trustee and Blaw-Knox Company, Plaintiffs,

v.

Robert C. WATSON, Commissioner of Patents, Defendant.

Civ. A. 2190-57.

United States District Court District of Columbia.

June 19, 1959.

Walter J. Blenko and Walter J. Blenko, Jr., Pittsburgh, Pa., Spencer B. Michael, Washington, D. C., for plaintiffs.

C. W. Moore, Solicitor, U. S. Patent Office, Washington, D. C., for defendant.

SIRICA, District Judge.

This is a civil action under 35 U.S.C.A. § 145 in which plaintiffs seek to compel the Patent Office to declare an interference between plaintiffs' application, Serial No. 406,319, entitled "Composition Boards Containing Douglas Fir Bark" and the patent issued to Clark C. Heritage (Re. 24,174), entitled "Cork-Bound Hot-Pressed Boards". The general subject matter involved here is the manufacture of composition boards from the components found in the wood and bark of coniferous trees such as the Douglas Fir. The specific controversy centers on the method of utilizing the "cork" component of the bark as a binder for the wood and bark fibers by the application of moderately high temperatures which cause the cork to flow throughout the whole mixture of fibers. The mixture would then be subjected to pressure sufficient to produce a board-like substance of greater or lesser density, with substantial strength and water-resistant properties. The value of using the cork element from the bark is that it reduces the need for adding quantities of more expensive "sizing" materials.

The following two claims out of the twelve in issue here serve to illustrate the Heritage process with the disputed words italicized:

"2. (29) A hard rigid board of the character of lumber comprising a closely compacted heat-bonded

mixture originally of wood particles, particles of the bark of coniferous trees, and particles of *isolated cork originating in such bark,* said cork being present in an amount equal to at least 5% of the mixture and said wood particles being present in amount in the range from 25% to 95% of the mixture.

"7. (34) A method of making a hot pressed hard rigid board of the character of lumber comprising the steps of admixing wood particles, comminuted bark of coniferous trees and a *separated cork fraction of said bark,* the latter being in an amount of at least 5% of the mixture and pressing the mixture under conditions of heat, pressure and time being sufficient to increase the density of the mixed mass into a hard compact board, and to cause the cork component to flow into intimate bonding admixture with the wood particles and bark."

A representative summary of plaintiffs' disclosure may be found on page 4 of their specification (Plaintiffs' ex. 1, p. 4):

"It is the essence of the present invention that, surprisingly and contrary to the teaching of the prior art, the bark of the Douglas fir when incorporated in fibrous composition boards not only is not detrimental, but *actually* enhances the value of the boards by increasing their water resistance to acceptable limits without seriously reducing their strength or otherwise adversely affecting their properties."

Plaintiffs contend that the use of comminuted Douglas fir bark results in the disassociation of the cork from the other bark components during the normal course of processing, thus freeing them for the most effective action as a binder. In the view of the Patent Office, however, the Heritage patent was primarily concerned with the complete isolation of the cork from the bark, the treatment of the cork and the mixing of this relatively pure cork with various proportions of

wood fibers. As the Board of Appeals stated at pages 59–60 of defendant's exhibit 1:

" * * * Heritage specially prepared the cork component of bark from coniferous trees and presents this as his claimed contribution. Appellants, on the other hand, use the whole bark of Douglas fir and mix its resulting constituents in connection with comminuting and follow with a wet or dry felting process. *We are not convinced that appellants inherently disclose a separation of the bark into a cork component by reason of their processing.* The fact that bark particles may separate from a slurry does not establish such a step in appellants' processing or that the bark so separated is of a fineness to present pure cork particles as distinguished from particles having attachment to other bark ingredients as described in the Heritage argument." (Emphasis supplied.)

On the basis of this reasoning, the examiner and the Board of Appeals agreed that plaintiffs' claims for an interference or conflict with the Heritage patent should be denied. This requirement of "inherent disclosure" is explained in the case of Hoover Co. v. Ooms, 1946, 80 U.S.App.D.C. 318, 153 F.2d 123, 125, where it is stated:

"It is thoroughly established that one who copies claims for interference cannot prevail unless his application discloses, expressly or inherently, the elements and limitations prescribed by the claim. It is insufficient that a certain result may come from a given set of circumstances."

In applying these principles, the Patent Office, with its extensive experience, came to the conclusion that plaintiffs' application does not disclose substantially the same patentable invention as that described in the Heritage patent.

In making its ruling, the Court is only concerned with whether the find-

ing of the Patent Office that plaintiffs did not disclose substantially the same patentable invention as Heritage is consistent with the evidence. Cf. Abbott v. Coe, 1939, 71 App.D.C. 195, 109 F.2d 449, 451. Furthermore, as was pointed out in Hoover Co. v. Ooms, supra:

> "* * * when one copies the claim of another's patent for interference purposes, the claims of the patent from which he copied determine the issue."

After examining both the Heritage patent and plaintiffs' application, it would seem that the wording of the Heritage claims tends to support the Patent Office ruling. In claim 2 (copied as claim 29) above, three components of the board are listed as: 1. wood particles, 2. particles of the bark of coniferous trees, and, 3. particles of *isolated* cork *originating* in such bark. These items are distinctly listed in the claim. No greater physical connection is implied between 2 and 3 than between 1 and 2. In addition, the use of the term "isolated" and "originating" together implies a complete removal of the cork from the location where it originally was; i. e., within the whole bark. Again with respect to claim 7 (copied as claim 34) above, the words used are "a *separated* cork *fraction* of said bark". The term "fraction" itself generally denotes a portion of a substance collected apart from the other components of the substance (Cf. Webster's New International Dictionary, 2d Ed., 1957 at p. 1000) and this idea has been emphasized by the use of the word "separated" along with it. Thus, the Patent Office ruling finds support in the claims themselves.

Assuming *arguendo* that the Heritage claims can be considered ambiguous, the court finds sufficient indications in the specification of Heritage that the primary concept is the use of separately collected cork particles obtained by a distinct step in the processing. This is revealed particularly in the paragraph at column 2, lines 3 to 35, quoted in part as follows:

> "The bark may be fractionated into its separate components by methods which rely upon the selective comminution of the bark constituents followed by the application of mechanical methods for separating the products of various particle size. Such methods are represented by those disclosed in the patent to Anway for Method of Treating Bark * * * in the patent to Pauley for Production of Pure Bark Fiber * * * and in the copending application of Bror L. Grondal and Calvin L. Dickinson, for Method of Treating Bark * * *. The whole bark is subjected to one or more comminuting operations at a controlled moisture content, whereby the non-fibrous phloem is reduced to a powder, the fiber bundles are opened up to release the individual fibers, but the relatively resistant aggregates of cork cells comprising the cork layers are not substantially reduced in size. There are thus produced three fractions having different particle sizes, i. e., powdered phloem or parenchyma tissue, ultimate fibers or stone cells (sclerenchyma tissue), and natural cork."

The Anway and Pauley patents relate to mechanical methods for entirely isolating cork and other particles by the use of screens of various sizes. The preferability of using pure cork over the use of whole bark is also emphasized in Heritage at column 2, lines 26 to 56. Moreover, Heritage cites tests that show that the presence of 20% of bark impurities in the cork reduces the rupture strength of the finished board three times in comparison with board involving the use of pure cork (column 10, lines 7 to 11). These passages and others stressed by defendant furnish an adequate basis, for holding that plaintiffs' application does not disclose substantially the same patentable invention as that of Heritage. Based upon all the testimony and exhibits adduced at trial, the Court is convinced that a rational basis existed for the rul-

ing of the Patent Office in denying an interference with the Heritage patent. Judgment, therefore, will be entered for defendant.

Counsel for defendant will prepare proposed findings of fact, conclusions of law, and an appropriate order within one week from this date.